# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| NICOLE PEREZ and KENNETH DURAN, for themselves and as Next Friend for their minor daughter I.D,<br><br>                Plaintiffs,<br><br>v.<br><br>FCA US LLC, aka FIAT CHRYSLER AUTOMOBILES; and DOES 1 through 100, inclusive,<br><br>                Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

## INTRODUCTION AND DEFECT EXPLANATION

1.  Plaintiffs allege the following based upon their own knowledge, publicly-available information, information and belief:

2.  Then three-year-old I.D. was catastrophically asphyxiated by the power window of her grandmother's dangerous and defective 2005 Chrysler Town and Country minivan.  As a result of the asphyxiation, her brain and brain function were forever harmed, she was rendered quadriplegic, and she requires care and support around the clock.

3.  Power windows in vehicles have injured thousands of children and killed dozens of children.  It takes just 22 pounds of force to suffocate or injure an infant while power windows can exert an upward force of 30-80 pounds of force.

4.  What goes up SHOULD go down.  Power windows have maimed and strangled thousands of children.  A safety feature commonly referred to as "anti-pinch," "auto-reverse," "anti-trap," or 'bounce-back," was invented almost 90 years ago which easily protects children and others from injury and death from automobile power windows.  Children are no match for over-powered power windows lacking auto reverse protections.

5.  Since 1990 over 65 children have been killed by power windows, with untold numbers of brain injuries and amputations of fingers, etc.; most of them to children age three or younger.

6.  For decades, FCA US LLC and predecessor entities it voluntarily assumed liability for (referred hereto collectively as "Fiat Chrysler") has had the knowledge and ability to install safer power windows that easily prevent child injury and strangulation.  Safer power windows have inexpensive and readily available auto-reverse functions which stop and reverse the power window when an obstruction is detected and thereby fully and easily avoid killing and maiming children.

- 1 -

7.      Had the 2005 Chrysler Town and Country minivan's power windows been equipped with widely available cost-effective auto-reverse child safety protection feature, like many cars of that vintage as well as many cars older than model year 2005, I.D., like many other children crippled, injured and killed by deadly power windows lacking in fail-safe auto reverse protection, would never have been harmed.

8.      Notably, the Subject 2005 model year Town and Country minivan included auto-reverse safety protections on and safety warnings for its rear power sliding <u>doors</u>, but failed to include the same life preserving safety protection on its front passenger windows.  The vehicle's owners manual explains that "If anything obstructs the power sliding door while it is closing or opening, the door will automatically reverse to the closed or open position, provided it meets sufficient resistance."



- 2 -

## BACKGROUND FACTS—POWER WINDOW DEFECT

9.    Fiat Chrysler's history of knowledge of the extraordinary safety risks to children associated with power window dates back decades.

10.    Strangulation is one of the most significant causes of accidental asphyxia in children.  As of 1997, for instance, publications estimated that at least 400 people per year in the U.S.A. alone experience injuries related to power window designs, and that the injuries are more frequent and more severe in children.

11.    Fiat Chrysler's knowledge of extraordinary power window risks of morbidity and mortality included the knowledge that inappropriately designed power windows and/or power window switches served as effective "electronic guillotines", and that the risk posed to the consuming public by poorly designed power windows was influential in incidents in which power windows resulted in death or injury.  Power window hazards could and should have easily been avoided by installing auto reversing window mechanisms.

12.    In the late 1950's and early 1960's, Fiat Chrysler began addressing issues associated with the inadvertent actuation of power windows.  During the course of addressing the issue internally, news articles in the Detroit community in July, 1962, reported an incident involving a small child caught in a power window and was seriously injured as a result.  The child was the two-year-old son of Jerome Cavanaugh, the Mayor of Detroit.  As a consequence, the Automobile Manufacturer's Association (AMA) announced the opening of an investigation to look for possible safeguards for the operation of power windows in cars and trucks.

13.    The AMA consisted of representatives from Ford, GM and Chrysler.  The Safety Committee of the AMA determined that safety shields placed around the levers had solved a similar problem associated with windows and rear doors.

14.     Fiat Chrysler knew at the time—1960—that it was not reasonably safe to have power window switches that operated independent of the ignition switch, and that so-called "lock-out" switches were necessary features in order to permit the driver to control operation of the all power windows so that risk of inadvertent actuation was decreased and/or eliminated.  As early as the introduction of the 1964 Thunderbird, American vehicle manufacturers were using technology designed to reduce and/or eliminate the risk of inadvertent actuation of power window switches.

15.     In the late 1960's and early 1970's, American auto manufacturers encouraged the federal government *not* to mandate "auto reverse" mechanisms, primarily based on representations that they were aware of the risks of poorly designed power window switch systems, and that their internal requirements were adequate to protect consumers from the risks associated with poorly designed systems, including the internal requirement of lock-out switches.

16.     The first patent for a power window that stopped closing upon contact with an object obstructing window operation was granted in 1932 to Ralph McNutt.  Since McNutt's patent nearly 90 years ago, at least 14 additional patents for auto-reverse mechanisms on power windows have been granted.

17.     Nevertheless, only a small fraction of Fiat Chrysler vehicles sold in America have been produced with life-saving auto-reverse sensing power window technology.  Many vehicles that are produced for sale or lease in the United States market without auto-reverse technology have European counterpart vehicles that are and/or were sold equipped with such "anti-trap" sensing technology.

18.     The Subject 2005 model year Town and Country minivan included auto-reverse safety protections on and safety warnings for its rear power sliding doors, but not also on its front passenger windows.

19.     The vehicle's owner's manual explains that the vehicle power doors had auto reverse safety mechanisms triggered by resistance "If anything obstructs the power sliding door while it is closing or opening, the door will automatically reverse to the closed or open position, provided it meets sufficient resistance." FCAUS-Duran 158.  The same auto reverse safety mechanisms could and should have been installed on the vehicle's power windows but Fiat Chrysler failed to do so.

20.     The vehicle owner's manual includes a black box warning for the power door explaining "WARNING! You or others could be injured if caught in the path of the sliding door. Make sure the door path is clear before closing the door."  Similarly, both sides of the vehicle had warning stickers on the thresholds of the power doors saying, "During power operation, personal injury or cargo damage may occur.  Ensure door travel path is clear.  Power operation lock out will disable vehicle door switches.  Make sure the door is closed and latched before driving away.  See Owner's Manual.  04894046AA"  The same or similar pinch warnings could and should have been utilized for the vehicle's power windows but Fiat Chrysler failed to do so.

21.     The fact that Fiat Chrysler vehicles long produced and sold in Europe (including during and before model year 2005) demonstrates that the safety technology is widely available and that equipping passenger vehicles with this injury-preventing design does not affect cost so significantly as to eliminate the availability of this safety option.

22.     It was technologically feasible for the 2005 Chrysler Town and Country minivan to have included auto reverse safety protections in its power windows.

23.     It was technologically feasible for the 2005 Chrysler Town and Country minivan to have included auto reverse safety protections in its power windows in a design which would have likely prevented I.D.'s injuries.

24.     It was economically feasible the 2005 Chrysler Town and Country minivan to have included auto reverse safety protections in its power windows in a design which would have likely prevented I.D.'s injuries.

25.     Estimates indicate that life-saving auto-reversing power window technology deployment would have cost as little as $8.00 (Eight Dollars) per power window in the 2005 model year vehicles like the one that crippled I.D.

26.     The lifesaving and injury prevention benefits of auto reverse window technology far outweighs the cost per vehicle for installing anti-trap sensors.  When a power window lacks auto reversing technology, children are placed at proven risk of injury and death due to the designed in hazard of power windows lacking fail-safe mechanisms.

27.     It is appropriate and necessary engineering practice in the automobile industry to conduct a Design Failure Mode and Effects Analysis (DFMEA) any time a manufacturer or a supplier of the product creates a new design, makes a design change to an existing design, or has a different application of an existing component or subsystem.

28.     In a DFMEA, engineers engage in a process by which they attempt to identify potential issues that may be presented by the design, redesign, or pairing of components.  In a DFMEA, all prior complaints, campaigns, warranty data or other documentation available on a specific component or system company-wide is reviewed and analyzed to identify potential failure modes of a product, develop a test protocol to test for each of the potential failure modes,

- 6 -

and through completing such tests to rule out (or identify) the ability of a design, redesign or pairing of components to fail as have earlier designs.

29.     Defendants in this action failed to conduct and/or failed to adequately conduct DFMEA and/or failed to heed results of DFMEA in their decision to fail to equip the subject vehicle with auto-reversing windows.

30.     By 2004, many vehicles already used window-retracting safety equipment in order to protect children and others from strangulation, including:

- Acura TL

- BMW 3-series, 5-series, 6-series, 7-series, X3, X5

- Cadillac CTS, DeVille, Seville, SRX, XLR

- Chrysler 300 C / Dodge SRT

- Ford Five Hundred, Explorer Sport Trac, Freestyle, Mustang

- Honda Accord

- Lexus GS, GX 470, LS 430, LX 470, RX 330

- Lincoln Aviator, LS, Navigator

- Mercury Montego

- Defendant's vehicles sold under the Mercedes brand,
  including Mercedes C, E and S series vehicles.

- Nissan Murano, Quest

- Toyota Camry, Sienna

- Volkswagen Beetle, Jetta, Passat, Phaeton, Touareg

31.     The Chrysler Town and Country minivans were specifically promoted as appropriate vehicles to safely transport families, including young children, and such promotions of vehicles lacking auto reverse safety features were and are false and dangerously misleading.

32.     Power windows lacking in auto reverse safety features present choking hazards that families need and deserve to be warned about and this action seeks injunctive relief requiring Defendants to warn all registered owners in Colorado of Chrysler Town and Country minivans of the  power window's lack of auto reverse and related choking hazards.

33.     A choking hazard is any object that can block a child's airway, making it impossible or difficult to breathe.

34.     Manufacturers and sellers of products that present choking hazards have long warned of the products' choking hazards and Colorado families with Colorado-registered Chrysler Town and Country vehicles with power windows lacking auto reverse all need and deserve to be warned of the vehicles' choking hazards.

35.     Proposed exemplar proposed warning stickers that Plaintiffs seek to have disseminated to Colorado registered owners of relevant Chrysler Town and Country and other minivans lacking auto reverse safety protections are available.

### DEFECTIVE WINDOW ROCKER SWITCH

36.     The 2005 Chrysler Town and Country vehicle's front passenger switch has a dangerous and defective window rocker switch easy for children to inadvertently activate. Defendants have known for decades that children inadvertently activated such switches.

37.     True and correct pictures of the dangerous rocker window switch in the 2005 Chrysler Town and Country follow:





38.     A representative diagram of a child's inadvertent activation of the switch follows and this diagram represents plaintiffs' understanding and belief of how I.D. inadvertently activated the switch and was strangled.  Once strangled by the power window, I.D. was unable to cry out for help due to the power window strangling her and cutting off her voice box and breathe.



## JURISDICTION AND VENUE

39.     The Court has subject matter and personal jurisdiction over Defendant FCA US LLC which is headquartered in this District, in Auburn Hills, Michigan.

40.     This court has diversity jurisdiction over this action under 28 U.S.C. § 1332 since the plaintiffs are residents and citizens of Colorado while the defendant FCA US LLC is headquarted in and a citizen of Michigan.  The amount in controversy in this action is many millions of dollars, significantly exceeding $75,000, because the disabled child I.D. requires around the clock care as well as supplemental oxygen and a feeding tube.

41.     Defendants at all times relevant to this action, engaged in the use, design, sale, labeling, marketing, promotion, servicing and/or distribution of motor vehicles and/or motor vehicle parts and the vehicle at issue in this action in Auburn Hills, Michigan.  As such, the Defendants purposefully availed themselves of the privilege of conducting activities within the State of Michigan and, in fact, maintain regular and continuous business contacts within the State.  Plaintiffs sustained damages and injuries as a result of Defendants' conduct in this jurisdiction.  The FCA US LLC Headquarters and Technology Center in Auburn Hills, Michigan is the headquarters and main research and development facility for the automobile manufacturer FCA US LLC (commonly known as Chrysler).

42.     Venue is proper in this jurisdiction because FCA US LLC's headquarters are in this jurisdiction.

## PARTIES

A.   **Plaintiffs**

43.   Plaintiffs NICOLE PEREZ, KENNETH DURAN sue for themselves and as Next Friends for their minor disabled daughter I.D. . NICOLE PEREZ, KENNETH DURAN and I.D. are, and at all relevant times herein were, residents of Denver, Colorado.

44.   On November 30, 2016, I.D., a previously normal, active, and happy three-year-old, suffered from severe anoxic brain injury when she was strangled by a faulty power window which lacked the auto reverse safety feature.  This horrific strangulation event left her unconscious and bystanders initiated CPR and called 911.  Emergency medical personnel arrived on the scene to find her unresponsive with a strong, rapid pulse and agonal breathing. Paramedics attempted to perform bag valve mask ventilation with an oropharyngeal airway (OPA) but significant gagging caused them to have difficulty placing the OPA.  Paramedics were also unable to start a peripheral intravenous line so she was forced to undergo the first of many painful, invasive procedures at the scene when intraosseous access was obtained.  This procedure is performed by inserting a needle directly into her tibia bone.

45.   I.D.'s brain damage is severe, catastrophic, and irreversible.  The loss of oxygen to I.D.'s brain has left her with significant and permanent impairments in consciousness, fine and gross motor skills, cognition, language, swallowing, and she is now an oxygen dependent spastic quadriplegic.  The once playful, bright and happy little girl is now non-verbal; she cannot eat, move, or even breathe on her own without the assistance of oxygen.

46.   Upon arrival to the emergency room at North Suburban Medical Center, I.D. was diagnosed with respiratory failure and required immediate intubation to save her life.  Other procedures that needed to be performed immediately were the placement of a 22-gauge intravenous access line, a Foley urinary catheter, and an orogastric tube.  Various labs were

drawn and head/neck CTs were performed.  I.D. was in critical condition and required immediate admission to a Pediatric Intensive Care Unit (PICU).  After she was medically stabilized at North Suburban Medical Center she was airlifted to Swedish Medical Center.

47.    At Swedish Medical Center she spent her first night after the horrific strangulation event intubated and sedated in the PICU.  During this hospitalization she was given a battery of tests and invasive procedures including:

      a.      Placement of a Central Line

      b.      MRIs of the Brain and Cervical Spine

      c.      CTs of the Head and Neck

      d.      Multiple X-Rays (Tibia/Fibula; Chest)

      e.      Multiple blood draws for labs and blood gasses

      f.      Electroencephalogram (EEG)

      g.      Endotracheal Intubation

48.    When she was initially extubated on December 1, 2016, I.D. developed stridor, significant wheezing, and a prolonged expiratory phase of respiration.  All of these symptoms limited her ability to breathe on her own without ventilator support because I.D.'s airway was edematous and traumatized.  During the short time that she was extubated, I.D. would look at people in the room for a short time but would then roll her eyes upward.  This first attempt at extubation failed because of upper airway obstruction and I.D. was reintubated at Swedish Medical Center soon after the failed extubation attempt.

49.    During her hospitalization at Swedish Medical Center from November 30, 2016 to December 5, 2016, I.D.'s clinical presentation as well as an EEG showed signs of encephalopathy.  She also developed clinical symptoms consistent with cerebral edema during

this time.  A consulting neurologist documented significant concern over the possibility of permanent brain injury in the days following the strangulation event, cautioning her distraught family that it would take time to determine what I.D.'s new neurologic baseline would be.

50.     From December 13, 2016 to February 23, 2017 I.D. was hospitalized at Children's Hospital Colorado (CHCO) for rehabilitation.  Immediately upon arrival to CHCO she was admitted to the PICU and remained there for a week because of significant stridor and airway concerns.  Her physical injuries began with anoxic brain injury caused by a faulty power window but this led to further injuries as many of her body's systems deteriorated in the setting of encephalopathy, hypoxia, immobility, and autonomic instability.  These injuries including agitation, increased tone, contractures, respiratory complications, and acquired torsion dystonia. Multiple surgeries and procedures have been performed diagnosed and treated for complications associated with her diagnosis of severe anoxic brain injury.  Some of the procedures she endured during the rehabilitation period included:

        a.      Microlaryngoscopy and bronchoscopy with microdebridement because of airway obstruction and granuloma formation.

        b.      Bilateral percutaneous Tendo-Achilles lengthening because of bilateral gastrocnemius/soleus/Achilles tendon contractures.

Laparoscopic placement of a feeding gastrostomy tube because of feeding dysfunction.

51.     Since I.D.'s discharge from CHCO rehab on February 23, 2017, I.D. has remained at risk for feeding problems, aspiration, respiratory instability, and contractures.  She achieved a Coma Scale score of 1.45 when she was discharged from rehab which indicated that she was consistently in a near-coma state.  The extensive physical, occupational, and speech therapies performed at CHCO did very little to improve her abilities.  I.D. was discharged from rehab in a

wheelchair and unable to communicate or to demonstrate purposeful movements with a diagnosis of severe hypoxic ischemic encephalopathy.

52.     From discharge from rehab to the present I.D. continues to suffer from invasive, painful medical procedures and is completely dependent on others for every aspect of her care. Some of the invasive medical procedures she has endured since being discharged from rehab are:

a.     Tooth removal for grinding of her teeth.

b.     Botulinum toxin and phenol intramuscular neurolysis for dystonia.

c.     Flexible laryngoscopy was done with suctioning for stridor.

d.     Flexible fiberoptic laryngoscopy, microlaryngoscopy, and Bronchoscopy for airway noises and bilateral vocal fold immobility.

e.     Multiple Botulinum toxin B intramuscular injections for dystonia.

53.     I.D. remains non-verbal, she will never speak again.  I.D. cannot purposefully communicate with her loving parents and caregivers and suffers from bowel and bladder incontinence.  Any illness as simple as the common cold requires a lengthy hospitalization and can quickly become a potentially life threatening medical emergency because of lung disease. I.D. has been hospitalized multiple times and has had countless medical appointments for conditions such as status dystonicus, agitation, Rhinovirus infections, contractures, stridor, acute respiratory failure secondary to respiratory infections, aspiration pneumonia, as well as for dental and orthopedic complications.

54.     Breathing is a moment to moment struggle for I.D. and she remains oxygen dependent and suffers from ineffective airway clearance, restrictive lung disease, and sleep disordered breathing because her chronic hypoxemia is worse at night.  Even her young bones cannot grow properly and she will very likely need with multiple orthopedic surgeries in the

future to treat hip dysplasia and possibly scoliosis.  I.D. will require a lifetime of care across many healthcare disciplines as well as 24/7 care for her moment to moment physical needs.  I.D. remains oxygen dependent with spastic quadriplegia and cerebral palsy, she will never recover and will remain dependent on others and at risk of serious complications for the rest of her life.

55.     Plaintiffs Nicole Perez and Kenneth Duran have sustained substantial damages in caring 24/7 for their daughter I.D.  Kenneth Duran has been forced to abandon a lucrative career in automobile body repair.  Nicole Perez has been forced to abandon a lucrative career working for a state college.  Both have suffered emotional distress and PTSD as a result of I.D.'s injuries and condition.  But for the care supplied by Nicole Perez and Kenneth Duran, I.D. would require 24/7 skilled nursing care costing hundreds of thousands of dollars a year or more.

56.     Plaintiffs' claims were equitably and/or legally tolled for one year and one week by the pendency of plaintiffs' claims in Colorado state and federal court; the Colorado United States District Court ultimately dismissed the claims without prejudice to refiling them in Michigan for lack of personal jurisdiction over FCA US LLC on November 20, 2019.  Colo. Rev. Stat. § 13-80-111 provides plaintiffs 90 days to re-file an action that was dismissed for lack of jurisdiction.

**B.     Defendants**

57.     Defendant FCA US LLC, aka Fiat Chrysler Automobiles is headquartered in Auburn Hills, Michigan and is incorporated in Delaware.

58.     Defendant FCA US LLC retains and retained all liabilities of CHRYSLER GROUP LLC and Chrysler LLC.  Defendant FCA US LLC, aka Fiat Chrysler Automobiles is referred to herein as "Fiat Chrysler", which includes all predecessor corporations for which FCA US LLC, aka Fiat Chrysler Automobiles has assumed liability.

59.     Chrysler LLC, now known as "Old Carco LLC,"[1] was a Delaware corporation with its principle place of business in Auburn Hills, Michigan and was authorized to do business in the State of Colorado.

60.     Chrysler LLC designed, manufactured, tested, assembled distributed, marketed, advertised and distributed the Minivan which is the subject of this lawsuit.  At all relevant times, Defendant CHRYSLER GROUP LLC, and/or its predecessor corporations, has manufactured automobiles, sport utility vehicles, trucks, and vans that are sold throughout the United States and in foreign countries.

61.     On or about April 30, 2009, Chrysler LLC and twenty-four of its subsidiaries filed a petition for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York.

62.     On or about June 1, 2009, the U.S. Bankruptcy Court for the Southern District of New York granted Chrysler LLC the relief it sought in its motion for an order authorizing the sale under 11 U.S.C. § 363(f) of substantially all of Chrysler LLC's assets to New CarCo Acquisition LLC, aka "New Chrysler."

63.     On or about August 6, 2009, the sale of Chrysler LLC's assets was affirmed by the U.S. Court of Appeals for the Second Circuit.  As a result of the sale, all assets of Chrysler LLC were transferred to New Chrysler, which then became known as Chrysler Group LLC.

64.     On or about August 27, 2009, CHRYSLER GROUP LLC wrote a letter to Senator Richard Durbin (IL) which stated in relevant part: "[W]e will announce today that the company [Chrysler Group LLC] will accept product liability claims on vehicles manufactured by

---

[1] Chrysler LLC was also previously known as Chrysler Corporation, DaimlerChrysler Corporation, and DaimlerChrysler North America Holding Corporation.

1861020.2

Old Carco before June 10 that are involved in accidents on or after that date."  See August 27, 2009 Letter from John T. Bozzella of Chrysler Group LLC to Honorable Richard Durbin.

65.     CHRYSLER GROUP LLC and its successor, defendant FCA US LLC has already effectively assumed liability for product liability claims involving vehicles including the one that injured I.D.  Defendant FCA US LLC is also referred to as "Fiat Chrysler", which shall include its predecessor corporations for which it has assumed liability.

66.     Subsequently CHRYSLER GROUP LLC underwent a merger in 2014 and changed its name to FCA US LLC, aka Fiat Chrysler Automobiles.  Defendant FCA US LLC, aka Fiat Chrysler Automobiles is headquartered in Auburn Hills, Michigan and is incorporated in Delaware.

67.     Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as DOES 1-100, inclusive, and, therefore, Plaintiffs sue Defendants by such fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed, believe and thereon allege that each of the fictitiously named Defendants is an agent, employee or affiliate of Defendants, and is responsible for the unlawful conduct herein alleged, and that said Defendants proximately caused the harm alleged herein.

### FIRST CAUSE OF ACTION
**(Breach of Warranty including design defect and failure to warn)**

68.     Plaintiffs incorporate by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein and further allege as follows:

69.     Defendant FIAT CHRYSLER knew and had reason to know that its minivans would routinely transport vulnerable children and that minivan users would rely on defendant's skill and judgment in designing, testing and producing minivans fit for such purposes.

- 17 -

70.     The subject 2005 model year Chrysler Town and Country minivan was not fit for safe transport of children because of its powerful, deadly and unsafe power windows lacking vital auto stop and/or auto reverse safety features.

71.     Defendant FIAT CHRYSLER and the Doe Defendants designed, engineered, manufactured, tested, assembled, marketed, advertised, sold and/or distributed the Minivan.  On or about August 27, 2009, Defendant FIAT CHRYSLER agreed to assume liability for product liability claims arising on or after June 10, 2009 involving vehicles manufactured by the predecessor corporation.

72.     Defendant FIAT CHRYSLER and the Doe Defendants are liable to Plaintiffs because the Minivan was defective and unreasonably dangerous for normal use due to its defective design, testing, and failure to warn, all breaches of the implied warranty of fitness for a family's safe use.

73.     Power windows in vehicles have injured thousands of children and killed dozens of children.  It takes just 22 pounds of force to suffocate or injure an infant while power windows exert upward force of 30-80 pounds of force, even though much less force is necessary to effectively close a vehicle window.

74.     What goes up SHOULD go down.  Power windows have maimed and strangled thousands of children.  A safety feature commonly referred to as "anti-pinch," also known as "auto-reverse," "anti-trap," or 'bounce-back," is a feature invented almost 90 years ago which easily protects children from injury and death from automobile power windows.  Children are no match for over-powered power windows lacking auto reverse protections.

75.     Since 1990 over 65 children have been killed by power windows, with untold numbers of brain injuries and amputations of fingers, etc.; most of them to children age three or younger.

76.     For many decades and since at least 1960, Fiat Chrysler has had the knowledge and ability to easily and inexpensively install safer power windows with auto reverse features that easily prevent child injury and strangulation.

77.     Safer power windows have inexpensive and readily available auto-reverse functions which stop and/or reverse the power window when an obstruction is detected and thereby fully and easily avoid killing and maiming children.

78.     Strangulation by power windows is an especially dangerous and deadly a problem because once entrapped by the power window, the child's airway is blocked and they are unable to cry out for help.

79.     Strangulation by power windows is especially prevalent in vehicles like the subject 2005 Chrysler Town and Country minivan equipped with dangerous and defective rocker window switches.  Rocker window switches are easily and accidently triggered by children, as likely occurred in this case and as diagramed above.  Flush window switches that must be pulled up to trigger power windows going up are much safer and were available for years before I.D. was injured.

80.     Had the 2005 Chrysler Town and Country minivan had safer window switches and/or had power windows been equipped with widely available cost-effective auto-reverse child safety protection features, like many cars of that vintage as well as many cars older than model year 2005, I.D., like many other children crippled, injured and killed by deadly power windows lacking in fail-safe auto reverse protection, would never have been harmed.

81.     Defendant FIAT CHRYSLER and the Doe Defendants are strictly liable to Plaintiffs due to said Defendants' failure to include auto reverse safety protection in its power windows as well as failure to provide adequate warnings of the substantial dangers known or knowable at the time of the Minivan's rocker switch and power window design, engineering, manufacturing, testing, assembly, marketing, advertising, inspection, maintenance, sale and/or distribution, up to the time of the accident.

82.     Defendant FIAT CHRYSLER and the Doe Defendants designed, engineered, manufactured, tested, assembled, marketed, advertised, inspected, maintained, sold, distributed, and placed on the market and in the stream of commerce a defective product, the Minivan, unreasonably dangerous to the consumers, knowing that the product would reach and did reach the ultimate consumer without substantial change in the defective condition it was in from the date when it left each of said Defendants' control.

83.     Defendant FIAT CHRYSLER and the Doe Defendants knew or should have known that the ultimate users or consumers of this product would not, and could not, inspect the Minivan so as to discover the latent defects described above and/or knew that the vehicle's lack of low cost auto reverse power window safety technology rendered it unreasonably danger.  The Minivan was defective when it left the control of each of these Defendants.

84.     Defendant FIAT CHRYSLER and the Doe Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the Minivan, whose defective design and lack of warnings caused it to have an unreasonably dangerous propensity in normal use to asphyxiate and entrap children.

85.     At the time of I.D.'s injury, the Minivan was being used in the manner intended by Defendant FIAT CHRYSLER and the Doe Defendants, and also in a manner that was

reasonably foreseeable by said Defendants as involving a substantial danger not readily apparent if adequate warnings of the danger were not given.

86.     I.D. was a foreseeable user of the Minivan.

87.     Defendant FIAT CHRYSLER and the Doe Defendants had clear knowledge of the extreme and hidden danger posed by the power window defects in the Minivan (and other defective FIAT CHRYSLER vehicles with the same defects) from reports of asphyxiation deaths and injuries.

88.     Despite this clear knowledge, Defendant FIAT CHRYSLER and the Doe Defendants failed to equip the vehicle with easily available and low cost auto reversing safety technology which would have totally prevented I.D.'s terrible injuries.

89.     Despite clear knowledge of extraordinary safety hazards of power windows without auto reversing safety mechanisms, Defendant FIAT CHRYSLER and the Doe Defendants failed and/or provide adequate warnings of the defect to operators so that operators could protect themselves and children under their care from the danger posed by the vehicle.

90.     Defendant FIAT CHRYSLER's decision to not equip the vehicle with life-saving auto reverse technology and/or decision to fail to warn of the danger posed by the defect was made by managing agents of the company acting within their authority and on behalf of Defendant FIAT CHRYSLER.

91.     The subject vehicle's power window also strangled I.D. because its design used many times more force than necessary to successfully close the window, an over-force which Defendants knew or should of known would strangle and choke children and prevent them from being able to make any noise, prevent them from crying out for help or assistance.

92.     Plaintiffs' damages and injuries were the legal and proximate result of the defective Minivan and said Defendants' failure to provide adequate warnings of the risks of substantial harm associated with the foreseeable use of the Minivan.

93.     The 2005 Chrysler Town and Country which strangled I.D. had a front passenger side seat power window which lacked any auto reverse safety mechanism.

94.     Power sliding doors in the 2005 Chrysler Town and Country included auto reverse safety protections in their power sliding doors as well as black boxed warnings of pinch hazards of the power sliding door.

95.     The 2005 Chrysler Town and Country failed to warn users that the rocker switches were susceptible to inadvertent child actuation, failed to warn that the front passenger side seat's power window was a pinch hazard and/or failed to warn that the power window lacked any auto reverse safety mechanism.

96.     Power window auto reverse safety mechanisms and safe non rocker style window switches were technologically and economically feasible for use in 2005 model year vehicles.

97.     Power window auto reverse safety mechanisms such as those in the power sliding door of the 2005 Chrysler Town and Country would have likely protected I.D. from any significant power window entrapment injury.

98.     Once a child is trapped and/or strangled by a power window, including by a power window design like that in the 2005 Chrysler Town and Country, they cannot make any sound(s) in order to alert anyone that they need help because the power window motor force is sufficient to choke a child.

99.     The 2005 Chrysler Town and Country minivan was specifically marketed to families as safe for families with young children.

100.     FCA US LLC's predecessor was known as DaimlerChrysler from 1998-2007 and DaimlerChrysler commonly used power window auto reverse safety features in its Mercedes' vehicles power windows in 2004 and 2005.

101.     FCA US LLC's predecessor was known as DaimlerChrysler from 1998-2007 and DaimlerChrysler commonly used auto reverse safety features in its power doors, including power doors in its 2005 model year Chrysler Town and Country minivans, including the Subject Vehicle.

102.     DaimlerChrysler could have chosen to use auto reverse safety mechanisms in the power windows of its 2004 and 2005 Chrysler Town and Country minivan, including the vehicle that injured I.D., and chose not to do so.

103.     Plaintiffs have suffered compensatory and general damages in excess of the jurisdictional minimum of this Court as a result.

104.     As a result, Defendant FIAT CHRYSLER and the Doe Defendants are liable to Plaintiffs for compensatory damages.

## SECOND CAUSE OF ACTION
### (Negligence)

105.     Plaintiffs incorporate by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein and further alleges as follows:

106.     Defendants, collectively and individually, owed a duty to Plaintiffs to use reasonable care in the design, engineering, manufacturing, testing, assembly, marketing, advertisement, inspection, maintenance, sale, warning and distribution of the Minivan, as well as any "fix" for the power window defect to be used by the public and ultimate users, like Plaintiffs, for the purpose for which they were intended.

1861020.2

107.    Defendants breached their duties and are guilty of one or more of the following negligent acts and/or omissions:

a.    Failing to use due care in the design, engineering, testing, sale and/or distribution of the Minivan and/or to utilize and/or implement reasonably power window switch and/or power window motor safe designs in the manufacture of the Minivan;

b.    Failing to provide adequate and proper warnings to the public and to Plaintiffs and their family of the Minivan's power window hazards and/or propensity to be involved in power window injury and/or death incidents when used in the manner for which it was intended;

c.    Failing to design, manufacture and incorporate or to retrofit the Minivan with reasonable safeguards and protections against power window injury and/or death incidents and the consequences thereof when used in the manner for which it was intended;

d.    Failing to adequately prevent, identify, mitigate, and fix defective designs and hazards associated with power window injury and/or death incidents in accordance with good engineering practices;

e.    Failing to notify and warn the public including Plaintiffs and their family of reported power window injury and/or death incidents and thus misrepresenting the safety of the Minivan and the model minivan generally;

f.    Failing to make timely and adequate corrections to the manufacture and design of the Minivan so as to prevent and/or minimize the problem of power window injury and/or death incidents;

g.    Failing to use due care in designing, the testing, inspection, maintenance and servicing of the Minivan at all times prior to the incident; and

h.      Otherwise being careless and negligent.

108.    Defendants knew or should have known from their testing of the production models of the Minivan, and/or its predecessors, and/or from other vehicles they manufactured, distributed, inspected and maintained that the vehicle was dangerous and defective.

109.    Defendants knew or should have known that the Minivan power window rocker switches and power windows lacking auto reverse technology all had a propensity to entrap and asphyxiate children. Defendants knew safer alternatives and adequate corrections were available which would have avoided the incident, and would have avoided Plaintiffs' damages and injuries.

110.    Defendants designed, engineered, manufactured, tested, assembled, marketed, advertised, inspected, maintained, sold, distributed, placed on the market and in the stream of commerce, and/or maintained and serviced the Minivan in a manner and in a condition unreasonably dangerous to the consumer.

111.    Defendants breached their duty to Plaintiffs by knowingly and deliberately manufacturing and selling the Minivan with an unreasonably dangerous defect and by failing to adequately fix the defect or otherwise warn Plaintiffs of the defect. Defendants had clear knowledge of the extreme and hidden damage posed by the power window defect created from the design of the Minivan (and other defective FIAT CHRYSLER vehicles with the same defect), engineering studies, the tracking of reports of accidents and injuries, and studying other vehicle designs. Defendant FIAT CHRYSLER's decision to refuse to remedy the danger posed by the defect, as well as all its decisions regarding the design, testing, and sale of the Minivan, were made by managing agents of the company acting within their authority and on behalf of Defendant FIAT CHRYSLER.

1861020.2

112.    Plaintiffs' damages and injuries were the legal and proximate result of the negligent actions of Defendants.

113.    Defendants are liable to Plaintiffs for compensatory and general damages.

### THIRD CAUSE OF ACTION
**(Gross Negligence/ Actual Knowledge)**

114.    Plaintiffs incorporate by reference all preceding paragraphs and allegations of this Complaint as if fully set forth herein and further alleges as follows:

115.    Defendant FCA US LLC had actual knowledge that its minivans' power windows were liable to strangle children and failed to add auto reverse to its windows and failed to warn families of the hazard. 3 year old K. Householder was strangled in the electric power window of her family's 1987 Plymouth Voyager minivan on June 8th, 1992; 13 years before the manufacture of Shirley Montoya's 2005 Chrysler Town & Country Minivan and 24 years before I.D.'s catastrophic injury.

116.    K.H.  and her 2 year old brother were briefly left in the running van while their parents worked roughly 20 feet away with an unobstructed view of the vehicle. The windows of the vehicle were rolled down at the time. Mr. Householder returned to the van 5 minutes after checking on the kids to find Kayley's neck stuck in the passenger side window of the vehicle.

117.    The Householder minivan, like the Duran minivan, were both equipped with electric power windows which lacked an auto-reverse feature which would stop or reverse the power window upon detecting an obstruction during closure. Both vehicles incorporated "rocker" style switches which controlled the power windows. Both vehicles lacked auto up.

118.    The defective switch and deadly window without auto reverse has long been confirmed to be deadly and dangerous.  Studies have long shown that such windows are prone to accidental actuation by children:

1861020.2

*"Research has led the [National Highway Traffic Safety Administration] to conclude that switch design is related to [occupants (particularly young children) unintentionally closing power windows on themselves]. In the accidental actuation incidents for which the type of switch is known, virtually all of the vehicles involved had "rocker" and "toggle" switches, which are much more prone to accidental actuation as compared to pull up-push down type switches…"*

119.    During a deposition Mr. Householder stated that his decision to buy this particular van was influenced by advertisements he saw on television and in magazines, which marketed the vehicle as a family van.

*"Well, I had seen a lot of advertisements on television. And it was a family van. There were a lot of commercials and things about how families could go on outings and things like that. And I had a fairly large family, and it seemed like a reasonable thing for us to do."*

120.    When he went to the dealership to buy the van, the salesman told him that it was a safe vehicle for families.

*"He just said it would be a great vehicle for the kids and it was safe and a lot of families were purchasing them and Chrysler went to great depths to make sure this van was safe."*

121.    Shirley Montoya also purchased her van with safety in mind. When asked in a deposition why she purchased a minivan, she stated that she *"wanted a safe car for my grandkids to be in."*

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as hereinafter follows:

122.    For medical and incidental expenses according to proof;

123.    For economic damages and for other special damages according to proof;

124.    For general and emotional distress damages;

125.    For loss of consortium;

126.    For costs of suit;

127.    For injunctive relief in the form of an Injunction requiring FCA US LLC to send letters and/or warnings stickers out to all registered owners in Colorado of relevant model year Chrysler Town and Country minivans regarding the power window's lack of auto reverse and the windows' related choking hazards to young children.

128.    For such other and further relief as the Court deems proper.


Dated:  November 26, 2019                    */s/ David M. Kramer*

                                          David M. Kramer (P63740)
                                          DAVID M. KRAMER, PLLC
                                          25892 Woodward Ave.
                                          Royal Oak, MI  48067
                                          (248) 210-6757
                                          (248) 542-6301
                                          david.kramer@dmkramerlaw.com


                                          Fabrice N. Vincent
                                          Robert J. Nelson
                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                          275 Battery Street, 29th Floor
                                          San Francisco, CA  94111-3339
                                          Telephone:  (415) 956-1000
                                          Facsimile:  (415) 956-1008
                                          fvincent@lchb.com
                                          kbyrd@lchb.com
                                          rnelson@lchb.com

                                          *Attorneys for Plaintiffs NICOLE PEREZ and*
                                          *KENNETH DURAN, for themselves and their minor*
                                          *daughter I.D.*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| NICOLE PEREZ and KENNETH DURAN, for themselves and as Next Friend for their minor daughter I.D, <br><br>          Plaintiffs, <br><br> v. <br><br> FCA US LLC, aka FIAT CHRYSLER AUTOMOBILES; and DOES 1 through 100, inclusive, <br><br>          Defendants. | Case No. _____ <br><br> **DEMAND FOR JURY TRIAL** |

### JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues.

Dated:  November 26, 2019

/s/ *David M. Kramer*

David M. Kramer (P63740)
DAVID M. KRAMER, PLLC
25892 Woodward Ave.
Royal Oak, MI  48067
(248) 210-6757
(248) 542-6301
david.kramer@dmkramerlaw.com

Fabrice N. Vincent
Robert J. Nelson
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
fvincent@lchb.com
kbyrd@lchb.com
rnelson@lchb.com

1861020.2

1861020.2